IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Sylvia S. Threatt,                          )
                                            )     Civil Action No. 6:08-1692-HMH-WMC
                    Plaintiff,              )
                                            )     **REPORT OF MAGISTRATE JUDGE**
          vs.                               )
                                            )
Michael J. Astrue,                          )
Commissioner of Social Security,            )
                                            )
                    Defendant.              )
_____   )

      This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

      The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

      The plaintiff initially filed application for disability insurance benefits (DIB) and supplemental security income benefits (SSI) in December 2001 and July 2002 (protective filing dates). Those claims were denied at the initial level and not appealed further.

      The plaintiff filed her current applications for DIB and SSI benefits on August 6, 2003 and July 9, 2003 (protective filing date), respectively, alleging that she

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

became unable to work on June 29, 2001.[2]  The applications were denied initially and on reconsideration by the Social Security Administration.  On May 28, 2004, the plaintiff requested a hearing.  The administrative law judge, before whom the plaintiff, her attorney, and a vocational expert appeared on January 12, 2006, considered the case *de novo*, and on March 2, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on March 19, 2008.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant meets the nondisability requirements for the period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)    The claimant's residual effects of a cerebrovascular accident, renal failure with anemia, asthma/sarcoidosis, diabetes mellitus, and obesity are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).
>
> (4)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> (5)    The claimant's allegations regarding her limitations are not substantiated by the total evidence of record and not credible.
>
> (6)    The claimant has the residual functional capacity to perform a range of light work, with no lifting or carrying of over

---

[2]The plaintiff originally alleged that her onset date of disability was June 29, 2001, but in a letter to the ALJ following the hearing, her attorney moved to amend the alleged onset date to May 23, 2004 (Tr. 69-70).

twenty pounds occasionally and ten pounds frequently, no standing and walking over six hours in a work day; an option to sit and stand at the workstation at intervals of about forty-five minutes; only occasional stooping, twisting, crouching, kneeling, and climbing of stairs and ramps; no climbing of ladders and scaffolds; only occasional fine dexterity or gripping with the left, non-dominant, hand; no foot pedals or other controls with the left lower extremity; and an environment free from poor ventilation, dust, fumes, gases, odors, and extremes of humidity and temperature.

(7)    The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

(8)    The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

(9)    The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

(10)    The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

(11)    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

(12)    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include light work as an inspector (500 such jobs in South Carolina and 50,000 in the United States); and security watch (200 such jobs in the state and 30,000 in the nation); and sedentary jobs as a sorter (400 such jobs in the state and 40,000 in the national economy); and surveillance monitor (200 such jobs in South Carolina and 30,000 in the United States).

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

3

**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff has a high school education (Tr. 165) and past work experience as an inspector in the textile industry (Tr. 162). When she filed her current applications for DIB and SSI, she reported that she stopped working on June 29, 2001, because her textile plant closed (Tr. 162). She originally claimed that June 29, 2001, was the date she became disabled (Tr. 77, 161). After the administrative hearing, she amended, via letter, the alleged onset date to May 23, 2004 (Tr. 70).[3] The plaintiff was 46 years old when the ALJ issued his decision (Tr. 77).

### *Medical Evidence*

The record reveals that the plaintiff has a history of chronic renal (kidney) insufficiency/failure since 1999, anemia related to the kidney problems, intermittently-controlled hypertension since 1990, pulmonary sarcoidosis[4] since 1993, intermittent depression, diabetes mellitus, a peptic ulcer and obesity (Tr. 198-99, 203, 205, 223, 249-315, 321). In 1993, she had a stroke (Tr. 223). She completed her shift at work that day, but was then hospitalized (Tr. 223, 316). Her symptoms included muscle spasms, numbness and weakness in both sides of her face and in her left arm and leg (Tr. 223-24). As a result of the stroke, the plaintiff was off work for over six months (Tr. 223). When she returned to work (apparently in a new position created for her, which allowed her to sit down and primarily use her right, dominant arm), she was having difficulty with daily nausea and

---

[3]The ALJ omitted the amended alleged onset date of May 23, 2004, from the decision. However, any potential error in that omission was harmless, since he fully considered the plaintiff's condition from June 2001 through his March 2006 decision, which encompasses the period at issue (May 2004 through March 2006).

[4]An inflammatory condition causing lumps of cells to accumulate in the internal organs, including the lungs. Symptoms may include shortness of breath, fatigue, weight loss, weakness, and low grade fever. *See* The Merck Manual Online Medical Library, *available at* http://www.merck.com/mmpe/sec05/ch056/ch056a.html.

vomiting, but as noted above, she continued to work at the substantial gainful activity level until the plant closed in June 2001 (Tr. 223).

In February 2002, State agency physician Dr. Darla Mullaney reviewed the plaintiff's medical records and assessed her physical residual functional capacity in connection with a prior claim.  Dr. Mullaney found the plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand/walk and sit about six hours each in an eight-hour workday; engage in limited repetitive pushing and pulling and use of hand and foot controls with the left arm and leg; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and engage in limited fingering (fine manipulation) with the left hand.  She also found the plaintiff needed to avoid extreme temperatures (Tr. 410-17).

A consultative physical examination by Dr. Elizabeth A. Dickinson in March 2002 showed the plaintiff continued to experience residual effects of her stroke, including weakness in her left arm and leg when fatigued, facial weakness, and muscle spasms.  As to her pulmonary sarcoidosis, the plaintiff reported "only some shortness of breath and an occasional cough."  She reported having two prior blood transfusions and currently using Epogen (Epo) injections due to her anemia.  It was noted at the time that the Epo injections "tend[ed] to help her keep a high enough blood count that she [was] not severely anemic."  Upon examination, the plaintiff had clear lungs without any wheezes, 4/5 left shoulder strength, 4/5 left hand grip strength, full 5/5 strength in both legs except for diminished 3-4/5 strength in the left hip, and some muscle spasms in the left leg and arm.  Her gait was "somewhat slowed and a little bit stiff, but fairly smooth."  Neurologically, the plaintiff had weakness in both sides of her face and intact sensation in all four extremities.   Dr. Dickinson opined as follows:

> [Plaintiff is] not going to be a good candidate for being easily
> hired by most available jobs at her skill level. She cannot use

7

the left arm or left leg repetitively. She is at high risk for a repeat stroke. She would not be able to work under stressful conditions or in any type of extremes of temperature, nor would she be able to handle heavy lifting, prolonged standing, walking, climbing stairs, or other forms of physical exertion. I think, she would willingly continue a job where she could sit and work with only that right arm but the likelihood of finding something like that is very remote.

(Tr. 224-26).

In October 2002, State agency physician Dr. Richard Weymouth reviewed the plaintiff's medical records and assessed her physical residual functional capacity.  Dr. Weymouth found the plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand/walk and sit about six hours each in an eight-hour workday; never climb ladders, ropes, or scaffolds; and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  Dr. Weymouth also found the plaintiff had limited ability to perform fingering (fine manipulation), and should avoid concentrated exposure to extreme temperatures and wetness (Tr. 383-84).

In the fall of 2003, the plaintiff was diagnosed with chronic obstructive asthma. After starting treatment, she reported having shortness of breath with "moderate to severe exertion," whereas she had previously been short of breath with only "mild" exertion (Tr. 239, *see* Tr. 239-46).

In October 2003, State agency physician Dr. J. H. Weston reviewed the plaintiff's records and assessed her physical residual functional capacity.  Dr. Weston found the plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand/walk and sit about six hours each in an eight-hour workday; and climb, balance, stoop, kneel, crouch and crawl occasionally (Tr. 372-79).

In March 2004, the plaintiff underwent a consultative evaluation by Dr. Kwame N. Iwegbue in connection with her current claims for DIB and SSI.  The plaintiff reported having "occasional" shortness of breath on exertion and denied taking any

8

medication for the pulmonary sarcoidosis (a prior medication had to be discontinued due to her ulcer). She said her stroke symptoms had improved spontaneously, although she still had some left-sided weakness. The plaintiff reported having shortness of breath with "minimal" exertion. She said her sister helped her with housework and cleaning. Upon examination, her lungs had good air entry and no crackles, wheezes or other sounds. She had grossly normal range of motion in major joints and no obvious asymmetry. Neurologically, she was fully oriented and had normal cranial nerves II through XII, normal deep tendon reflexes, and normal sensory and motor testing. Dr. Iwegbue noted that the plaintiff's blood pressure remained uncontrolled despite multiple medications. He did not discuss any functional limitations (Tr. 316-19).

In April 2004, State agency physician Dr. F. Keels Baker reviewed the plaintiff's medical records and assessed her physical residual functional capacity. Dr. Baker found the plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and stand/walk and sit about six hours each in an eight-hour workday, with no other limitations (Tr. 360-67).

In August 2004, the plaintiff's kidney specialist, Dr. S. Steven Haigler, noted that she had "stable" renal function and had been out of her medications. The plaintiff said she was unable to continue Epo injections for her anemia due to insurance problems (Tr. 418).

Also in August 2004, the plaintiff presented to AmeriCare Health and complained of numbness, weakness and pain in her right arm, which had been present for six months. She reported that she sometimes dropped things. The attending physician's impression as to those symptoms was carpal tunnel syndrome. He noted that she had 4/5 motor strength in her right hand (Tr. 438).

In December 2004, the plaintiff presented to Carolina Respiratory Specialists for follow-up care of her asthma. She said that she was out of asthma medication and had

9

shortness of breath with "moderate" exertion.  Pulmonary testing showed a moderate to severe airway obstruction, and she restarted her asthma medications (Tr. 425-26).

At six-month follow-up visits for kidney value retests in 2005 and 2006, Dr. Haigler noted that the plaintiff's blood pressure was not under control.  At times, she was out of medication or reported difficulty getting her insurance to pay for medication (Tr. 452-56).

In November 2005, the plaintiff again reported right wrist pain and numbness at AmeriCare, and subsequently underwent a nerve conduction study.  The study suggested peripheral neuropathy (Tr. 465-67).

In December 2005, an examination at AmeriCare revealed decreased grip strength in both of the plaintiff's hands (Tr. 462).

Also in January 2005, Dr. Fidelis Edosonowam completed a "Medical Statement Regarding Chronic Anemia for Social Security Disability Claim."  He opined that the plaintiff's hematocrit level (red blood cell count) did not persist at 30% or less, and that she had not required blood transfusions for anemia.  He did not circle any restrictions on her ability to stand, sit, lift, or work (Tr. 475).

In January 2006, pulmonologist Dr. Fred C. Umeh completed a "Medical Statement Regarding Asthma for Social Security Disability Claim."  He stated that the plaintiff had severe persistent asthma and could stand 15 minutes at a time; sit 30 minutes at a time; not do any lifting (frequent or occasional); not tolerate dust, smoke, or fumes; and not work at all (Tr. 471-72).

Also in January 2006, orthopedist Dr. Sandra M. Abda, wrote a note stating that the plaintiff was under her care for carpal tunnel syndrome with tendinitis, and that she "may need a carpal tunnel release in the future" (Tr. 476).

10

***Other Evidence***

In an activity questionnaire completed in August 2003, the plaintiff reported that she lived at home with her grandchildren, that she could not cook due to nausea, that others did household chores and shopping for her, and that she had shortness of breath and chronic fatigue and weakness (Tr. 174). She reported that she drove a car, but that "after driving a good distance, [her] hands and feet [became] numb and [she got] real tired and sleepy" (Tr. 176).

***Administrative Hearing Testimony***

At the January 2006 administrative hearing, the plaintiff testified that her most recent textile job consisted of inspecting samples of bathrobes and pajamas and doing paperwork, and that she did this job for six and one-half years (Tr. 536-37). Previously, she worked at the same company as a presser, pressing bathrobes, pajamas and gowns, and doing some of the inspection duties (Tr. 538). She denied doing any significant lifting as an inspector, and lifting no more than 10 pounds as a presser (Tr. 538). She testified that she had "worked through two blood transfusion[s], a bone marrow biopsy and a kidney biopsy, and had bleeding ulcers. I mean I worked, but I was sick. I worked because I had to" (Tr. 558). The plaintiff testified that she left the job because the plant closed (Tr. 541) and that she had looked for a job "many a times" [sic] since then (Tr. 558-59).

The plaintiff testified that she had weakness in her facial muscles and general weakness on the left side that limited her from grasping objects tightly and made her left arm tire easily (Tr. 543). She testified that she could use her left arm for 15 to 20 minutes and would then need to rest it for 30 minutes (Tr. 543). She testified that she had pain in her left leg, particularly with sitting, and that she could stand or sit at her last job in 45-minute increments (Tr. 543-44). She testified that her right arm had weakened over the past year and had developed "unbearable" pain (Tr. 545). She said that she would need

11

surgery (Tr. 550) and had been told to get a splint for her right wrist (Tr. 553).  The plaintiff said she had already been wearing a splint before that point (Tr. 554).  She also testified that she could walk five minutes before having shortness of breath and wheezing (Tr. 558). She reported dizziness and headaches from her hypertension, and nausea from pain medication (Tr. 560-61).

From an activity standpoint, the plaintiff testified that she had a valid driver's license and shopped for groceries (Tr. 534-35).  She testified that she lived with her three grandchildren, who were eight, seven, and five years old, and that the mother of the children was "in and out" (Tr. 535).

Vocational expert Charlie A. Edwards first considered a hypothetical question pertaining to an individual of the plaintiff's age, education and past job experience, with the following work restrictions:

• no lifting or carrying over 20 pounds occasionally and 10 pounds frequently;
• no standing and/or walking for six hours in an eight-hour workday;
• only occasional stooping, twisting, crouching and kneeling;
• no climbing of stairs, ramps, ladders or scaffolds;
• only occasional fine dexterity or gripping with the left non-dominant hand;
• only occasional use of the left lower extremity for foot pedals or other controls;
• an environment free from poor ventilation, dust, fumes, gases, odors and extremes of humidity and temperature

(Tr. 564).  Mr. Edwards testified that such an individual could perform the plaintiff's prior job as an inspector[5] or other inspector jobs (500 jobs in South Carolina and more than 50,000 nationwide).  He also testified that the individual could perform the light jobs of security watch person (200 jobs in South Carolina and more than 30,000 nationwide) and school bus monitor (150 jobs in South Carolina and more than 40,000 jobs nationwide), as well as the sedentary jobs of surveillance monitor (300 jobs in South Carolina and more than

---

[5]Mr. Edwards clarified that the job – as generally performed – is light in exertion, while the job created for the plaintiff was "more of a semi-light (INAUDIBLE) and sedentary job" (Tr. 567).

30,000 nationwide) and sorter (1,200 jobs in South Carolina and more than 40,000 nationwide) (Tr. 564-65).

Mr. Edwards testified that the additional restriction of a sit/stand option in 45-minute increments would not change his testimony (Tr. 566).

The ALJ then asked about the added restriction of "only occasional fine dexterity or gripping with the right dominant hand in addition to the same restriction with the left. Would that change your response to the hypothetical, sir?" (Tr. 566). Mr. Edwards responded, "Yes, sir. That would take her out of (INAUDIBLE)" (Tr. 566).

With regard to the inspector jobs, Mr. Edwards testified that if the individual could not use her left arm repetitively, the job numbers would be reduced by one-third (Tr. 567).

## ANALYSIS

The plaintiff alleges disability since May 23, 2004,[6] due to a stroke, sarcoidosis, high blood pressure, kidney problems, shortness of breath, anemia, and leg problems. She was 46 years old when the ALJ issued his decision, and she has past relevant work experience as a garment inspector and presser. The ALJ found that the plaintiff retained the residual functional capacity ("RFC") to perform a range of light work, with no lifting or carrying of over 20 pounds occasionally and ten pounds frequently, no standing and walking over six hours in a work day; an option to sit and stand at the workstation at intervals of about 45 minutes; only occasional stooping, twisting, crouching, kneeling, and climbing of stairs and ramps; no climbing of ladders and scaffolds; only occasional fine dexterity or gripping with the left, non-dominant, hand; no foot pedals or other controls with the left

_____

[6]The plaintiff originally alleged that her onset date of disability was June 29, 2001, but in a letter to the ALJ following the hearing, her attorney moved to amend the alleged onset date to May 23, 2004 (Tr. 69-70).

13

lower extremity; and an environment free from poor ventilation, dust, fumes, gases, odors, and extremes of humidity and temperature. The plaintiff argues that the ALJ erred by (1) failing to find that her impairments met or equaled a listing; (2) failing to include all of her impairments in the hypotheticals to the vocational expert; (3) failing to address her amended onset date; (4) stating on the record that he would concede that she did nothing to care for her three grandchildren, but then explicitly relying on this evidence as a basis for finding she was not disabled; (5) failing to give proper weight to the opinion of her treating physician; (6) failing to give proper consideration to the opinions of the agency's consultative, examining physicians; and (7) relying on conclusions that were not supported by the evidence.

### *Listings*

The plaintiff alleges that the ALJ erred by failing to consider all the medical evidence and failing to find that she met or equaled Listings 6.02, 7.02, or 9.08. The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d).

First, the plaintiff argues that her impairments equal Listings 7.02 (chronic anemia) and 6.02 (impaired kidney function). As argued by the defendant, a claimant cannot establish equivalence to a Listing merely by showing that the overall functional impact of her combination of impairments was as severe as that of a listed impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). Instead, the claimant must "present medical findings equal in severity to *all* the criteria for the most similar listed impairment." *Id.* (emphasis in original). Furthermore, the claimant must show that all the medical criteria of that Listing were equaled for a period of 12 consecutive months. *See* Social Security Ruling (SSR) 86-8, 1986 WL 68636, *3 ("Thus, when such an individual's impairment or

14

combination of impairments meets or equals the level of severity described in the listing, and also meets the duration requirement, disability will be found. . . ."); 20 C.F.R. § 416.909.

Listing 7.02 (anemia) requires, in part, hematocrit levels persisting at 30% or less. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 7.02. The plaintiff argues that her hematocrit readings were "below the 30% mark on five [out of 25] occasions" (pl. brief 7). However, her five hematocrit readings below 30% all occurred before her amended alleged onset date of disability; in other words, they occurred during a period in which she has conceded that she was not disabled (pl. brief 7). She has given no medical findings that would meet or equal this criterion of Listing 7.02 on or after May 23, 2004.

Likewise, the plaintiff has not demonstrated medical findings equivalent to all of the criteria in Listing 6.02 (impairment of kidney function). While the listing requires persistent elevation of creatinine levels to 4mg per deciliter or higher over a three month period with persistent sensory neuropathy, the plaintiff admits that her creatinine levels "generally stayed in the 1.9 to 2.5 range" (pl. brief 8). Rather than providing specific medical findings equivalent to this Listing's requirements, present for 12 consecutive months, her sole argument is that "[g]iven how closely [she] comes to meeting Listing 7.02, along with her evidencing problems approaching [L]isting level for 6.02C2," it would seem that her combination of impairments equal a listing (pl. brief 8). Again, however, a claimant cannot establish equivalence to a listing merely by showing that the overall functional impact of her combination of impairments was as severe as that of a listed impairment. Based upon the foregoing, this allegation of error is without merit.

The plaintiff next argues that her limitations meet Listing 9.08 (Diabetes Mellitus). That listing requires in pertinent part:

> *Diabetes mellitus*. With:
> A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (*see* 11.00C) . . . .

15

20 C.F.R. pt. 404, subpt. P, app. 1, § 9.08(A). The defendant argues that the plaintiff's diabetes does not meet all the criteria for Listing 9.08(A), because while her arm and leg have some residual weakness from her stroke, her diabetes has not caused "significant and persistent disorganization of motor function in two extremities" as required by Listing 9.08. *Id.* The defendant argues that the plaintiff is misapplying the residual effects of her stroke to the listing for diabetes.  The plaintiff argues that there is no language in the listing requiring that the conditions in the listing must arise solely from the listed impairment as she "is equally as disabled whether those conditions arise solely from the [diabetes] or in combination with other existing medical conditions" (pl. reply brief 2-3).  Furthermore, the plaintiff argues that the ALJ's failure to at least set forth his reasoning as to why he found she did not meet this listing is reversible error.  This court agrees.  Upon remand, the ALJ should be instructed to set forth his reasoning for finding the plaintiff's impairments did not meet or equal this or any other listing.

### *Vocational Expert*

The plaintiff next argues that the ALJ failed to include all of her impairments in the hypothetical questions to the vocational expert ("VE").  "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

In the first hypothetical (Tr. 564), the ALJ asked the VE to assume that an individual could lift 20 pounds occasionally; 10 pounds frequently; could not stand/walk more than six  hours; could only occasionally stoop, twist, crouch; could not use stairs, ramps, ladders, scaffolds; had only occasional fine dexterity or gripping with left non-dominant hand; had only occasional use of the left lower extremity for foot pedals/controls;

16

and needed to be free of environmental contaminants or extremes of humidity and temperature.  In his second hypothetical question, the ALJ added to the previous hypothetical the restriction of a 45-minute sit/stand option (Tr. 566).  Finally, in his third hypothetical, the ALJ added the restriction of only occasional fine dexterity or gripping with the right dominant hand (Tr.566).  The VE testified that with the addition of that restriction, there would be no jobs the plaintiff could perform (Tr. 566).

The plaintiff argues that the ALJ erred in failing to include in his hypothetical questions the effects of her chronic anemia caused by her chronic renal insufficiency.  The ALJ does not set forth his rationale regarding how an individual suffering from the lethargy and fatigue from anemia caused by renal insufficiency could work eight hours a day, five days a week on an ongoing, sustained basis.  The defendant argues, "To the extent Plaintiff claims she could not work on a regular and sustained basis due to fatigue and general weakness, the ALJ gave her the benefit of the doubt by providing a sit/stand option and citing sedentary jobs, which require the lowest possible level of exertion" (def. brief at 19).  This is a post-hoc rationalization not offered by the ALJ.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").  Further, as noted by the plaintiff, two of the jobs cited by the vocational expert were light jobs rather than sedentary jobs (Tr. 30).  The plaintiff further argues that the ALJ failed to include the clear restriction set out by the consultive, examining physician that any potential jobs be free from stressful conditions (Tr. 226).  The ALJ's failed to set forth his reasoning for not including these conditions, although the conditions are documented in the record.  Accordingly, upon remand, the ALJ should be instructed to reconsider the plaintiff's residual functional capacity and to include all of the plaintiff's impairments in the hypothetical to the vocational expert.

***Amended Onset Date***

The plaintiff originally alleged that her onset date of disability was June 29, 2001, but in a letter to the ALJ following the hearing, her attorney moved to amend the alleged onset date to May 23, 2004 (Tr. 69-70). The plaintiff argues that the ALJ erred by failing to acknowledge the amended onset date in his decision. This court agrees.

During the plaintiff's hearing, the ALJ stated, prior to questioning the vocational expert, that "the problem with the upper – right upper extremities can take anybody out I would think. I'd go to the VE [vocational expert] of [sic] being able to work at the light and sedentary level from what I've seen in the past. In view of that, have you considered an amended onset date in this case?" (Tr. 555). That question came subsequent to a rather lengthy discourse among the ALJ, the plaintiff, and the plaintiff's attorney regarding the plaintiff's problems with her right hand/arm (Tr. 545-55). When her attorney began questioning her about her right arm, the plaintiff testified that her right arm had started getting weaker over the last year and that she was currently wearing a splint. The splint was prescribed by the orthopaedist to whom she had been referred by her family doctor. The orthopaedist believed the plaintiff might have carpal tunnel syndrome (Tr. 545). The ALJ asked whether or not a nerve conduction study test had been conducted on the right arm. In response, the plaintiff's attorney pointed to the results of that study conducted on November 14, 2005 (Tr. 465-66). In response to the ALJ's question as to what a handwritten notation under the "Impression/Comments" section said, the attorney replied that "it looks like peripheral neuropathy" (Tr. 547). The attorney pointed out the impression of peripheral neuropathy on the AmeriCare Health record of the same date, made in the same handwriting (Tr. 467, 547).

When the ALJ further requested the attorney to show him in the record where the plaintiff first reported the problem with her right hand, the attorney asked to have the opportunity to provide that information to the ALJ after the hearing. (Tr. 552). The ALJ then

18

stated that November 14, 2005, was the first indication that he found in the record of peripheral neuropathy, if the interpretation of the handwriting by the plaintiff's attorney was correct (Tr. 553).

Presumably in response to these discussions, the ALJ posed a third hypothetical to the VE, which added the limitation of only occasional fine dexterity or gripping with the right dominant hand (Tr. 566). The VE responded that that would take her out of the workplace (Tr. 566). Near the conclusion of the hearing, the plaintiff's attorney again asked on the record to be allowed to look through the medical information to determine if there was a notation of problems with the plaintiff's right dominant hand prior to November 14, 2005 (Tr. 569-70). In response, the ALJ replied, "That's fine. Whatever you'd like to do and then if you want to amend, you can just put that in writing and –" (Tr. 570). Following this discourse, the plaintiff's attorney sent a letter to the ALJ on January 13, 2006, the day after the hearing (Tr. pp. 69-70). In that letter, the attorney set forth the references to medical problems with the plaintiff's right hand that were contained in the record and provided the ALJ with the exhibit and page number (Tr. 331, 188, 438, 462, 467, 468; *see also* Dr. Abda's report, which was provided to the ALJ by letter from the plaintiff's attorney dated January 25, 2006. That letter and the accompanying report from Dr. Abda were apparently inadvertently omitted from the transcript of record but have been provided by the plaintiff in this action as an exhibit to her brief).

In her letter of January 13, 2006, referencing problems with the plaintiff's right hand, the attorney moved to amend the alleged onset date to May 23, 2004, since that was the first date when a clear, unequivocal complaint regarding the plaintiff's right hand appears in the record. On that date, the plaintiff stated, "I have lost strength in my right arm" (Tr. 188).

The plaintiff argues that the ALJ indicated in his on-the-record discussion that if she would amend her alleged onset date to the time when her right hand began giving her

difficulty, he would issue a favorable decision. The defendant argues that the colloquy does not contain an assurance that the ALJ would find the plaintiff disabled based on the right hand limitations if she amended the onset date. Rather, the defendant argues that the ALJ "was stating his concern that problems with the dominant right hand *could* prove disabling, and that he would consult the vocational expert" (def. brief 13).

While it is unclear from the record what the ALJ meant by his comments, what is not disputed is that the ALJ did not address the impact of the plaintiff's problems with her dominant right hand/arm on her residual functional capacity (pl. brief 11-14; def. brief 19). This was error. Accordingly, upon remand the ALJ should be instructed to consider the evidence regarding the plaintiff's right hand limitations in the residual functional capacity analysis. Further, the ALJ should be instructed to consider the alleged amended onset date of disability and the correct relevant period in his decision.

### Credibility

The plaintiff next argues that the ALJ erred in his credibility analysis by relying on inappropriate evidence. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Further-more, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The plaintiff testified at her hearing that her three grandchildren, ages five, seven, and eight, lived in her home (Tr. 534-35). In response to the ALJ's questions, she testified that the children's mother (the plaintiff's daughter) "comes in and out "of the home (Tr. 535). All three children are in school (Tr. 535). The plaintiff's three grandchildren were taken from their mother and placed in two different foster homes. The plaintiff, her sister, and her niece (who all live in very close proximity to each other) agreed that they did not want the children to have to live in foster homes. The plaintiff's house was capable of accommodating the children, and her sister and niece were willing to care for the children. While the plaintiff was unable to walk during the weeks immediately following her stroke, her sister and niece cared both for the children and for the plaintiff. When the plaintiff's attorney attempted to have her explain the situation regarding the children, the ALJ stated,

21

"I don't need to know about that" (Tr. 556).  He then asked the plaintiff, "You're doing the shopping, the laundry, what else for these three kids when the mother's in and out?" (Tr. 556).  The plaintiff stated, "I don't do it. I have my sister..." (Tr. 556).  At that point, the ALJ asked, "Somebody comes over and does all this for you?" (Tr. 556).  When the plaintiff's attorney again tried to allow the plaintiff to explain the situation, the ALJ stated on the record, "No. That's fine. I'll accept that, that she doesn't do anything for those children. Somebody comes over and does everything; laundry, feeding, cooking, everything" (Tr. 556-57).  According to the plaintiff's attorney, when she made one last effort to explain, the ALJ replied "All right" in a tone that made it clear that he did not want any more information on the subject (pl. brief 15; Tr. 557).  The plaintiff's attorney replied, " Okay. With that being the understanding" (Tr. 557) and moved on to the next line of questioning.

In his decision, however, the ALJ stated as follows in assessing the plaintiff's credibility:  "It is important to note that the Claimant's three grandchildren, ages 8, 7, and 5, live with her and that she is the primary caretaker for the children.  She further stated that they have been living with her since 2000 " (Tr. 28).  As the ALJ refused to allow testimony regarding the care of the children by the plaintiff's sister and niece and as he stated on the record that he would accept that the plaintiff "didn't do anything for those children" (Tr. 557), it was error for the ALJ to rely on that same evidence to find that the plaintiff's allegations were not credible.

### Treating and Examining Physicians

The plaintiff next argues that the ALJ failed to give proper weight to the opinion of her treating physician, specifically Dr. Umeh, the plaintiff's pulmonologist, who completed a "Medical Statement Regarding Asthma for Social Security Disability Claim." He stated that the plaintiff had severe persistent asthma and could stand 15 minutes at a time; sit 30 minutes at a time; not do any lifting (frequent or occasional); not tolerate dust,

22

smoke, or fumes; and not work at all (Tr. 471-72).   The ALJ stated in his decision, "Treatment records from Dr. Umeh and his colleagues in his clinic do not support those conclusions, nor do those of other physicians treating the Claimant or the results of several pulmonary function studies over time" (Tr. 29).  The ALJ then concluded, " I do not find the opinions of . . . Dr. Umeh to be persuasive in evaluating the claimant's disability" (Tr. 29).

> Consultative, examining physician Dr. Dickinson opined as follows:
>
>> [The plaintiff  is] not going to be a good candidate for being easily hired by most available jobs at her skill level. She cannot use the left arm or left leg repetitively. She is at high risk for a repeat stroke. She would not be able to work under stressful conditions or in any type of extremes of temperature, nor would she be able to handle heavy lifting, prolonged standing, walking, climbing stairs, or other forms of physical exertion. I think, she would willingly continue a job where she could sit and work with only that right arm but the likelihood of finding something like that is very remote.

(Tr. 224-26).   The ALJ did not acknowledge this opinion in his decision.   One of the Agency's consultative, nonexamining physicians interpreted Dr. Dickinson's opinion to be that the plaintiff was disabled (Tr. 416).  Another consultative examiner, Dr. Iwegbue noted that the plaintiff's blood pressure remained uncontrolled despite multiple medications.  He did not discuss any functional limitations (Tr. 316-19).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's

findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

Upon remand, the ALJ should be instructed to evaluate the opinion of treating physician Dr. Umeh in accordance with the above-cited law. Further, the ALJ should be instructed to consider the opinion of examining physician Dr. Dickinson and provide his reasons for discounting the opinion.

24

*Evidence*

Lastly, the plaintiff argues that the ALJ erred by relying on two conclusions that were not supported by substantial evidence. The ALJ decided that the plaintiff had repetitively used her left arm during the six and a half years following her convalescence from her stroke. He also decided that the plaintiff's employer did not create a job that could not be found in the field of competitive employment as a means of accommodating the plaintiff's significant limitations. The plaintiff argues that the ALJ reached these two conclusions despite the fact that every piece of evidence in the record directly contravenes these conclusions. This court agrees.

The ALJ stated in the hearing, "She was able to use [her left arm repetitively] to work six and a half years doing a job even though she indicates that they created a position for her. Plus she's been driving. She's been driving and doing – – . How long did the three children live with you, ma'am?" (Tr. 556). In his decision, the ALJ relied on the plaintiff's return to work after her stroke (Tr. 28) as a reason to doubt her credibility.

The ALJ's conclusion that the plaintiff had used her left arm repetitively in her job for six and a half years is without support in the record. The plaintiff testified that when she returned to work after her stroke her employer "put a job together" for her (Tr. 540). This job of sample inspector had previously been one of many tasks performed by the plaintiff's supervisor. This became the plaintiff's sole job so that she did not have to use her left arm, work on production, or work on a deadline (Tr. 540-41). Dr. Dickinson, one of the consultive examining physicians, noted in her report that the plaintiff "was primarily doing work that allowed her to sit down and work with her right arm, which is her strong arm. She was not having to do any stooping, bending, lifting, prolonged standing, walking or climbing up stairs, and she did not have to work or lift with her left arm" (Tr. 223-24). Dr. Dickinson concluded that the plaintiff could not use her left arm or left leg repetitively (Tr. 226).

25

The plaintiff also submitted the affidavit of her former supervisor, Sharon Blalock.  In her affidavit, Ms. Blalock stated that the plaintiff and she worked at the same plant from 1991 through 2001.  Ms. Blalock was the plaintiff's direct supervisor from 1996 through 2001.   After the plaintiff's stroke, the employer "created a job specially to accommodate her limitations upon her return." (Tr. 512).  Ms. Blalock stated that Comar Industries was a family-owned business that operated for approximately 30 years.  The company made every effort to accommodate employees with injuries, health problems, or family circumstances (Tr. 512).

The ALJ apparently did not believe the plaintiff's testimony and stated as follows in the hearing:  "I don't know about you, but I've not really noticed that the mills were the kindest employers in creating jobs for individuals" (Tr. 591).  "Didn't seem to – from what I've read it's, you know, thirty five years and you come in and you have carpel tunnel syndrome, and you're out.  See you" (Tr. 571).

In contravention of the evidence in the record, the ALJ concluded that the plaintiff repetitively used her left arm in her work following her stroke and that her employer did not create a special accommodation job for her.  Additionally, as argued by the plaintiff, the ALJ seemed to indicate that if an employer allowed an employee to work doing what had previously been one of many duties of another employee, that job could not constitute a special accommodation position.[7]  This is incorrect.  *See* 20 C.F.R. § 404.1573.  Based

---

[7]The ALJ stated in the hearing:
> If she could do the job - the plant shut down.  She may not even be able to do that job as performed in the national economy, but she could do that specific job.  If somebody created a job for her under special circumstances . . . where they would let her go lie down every half hour, that kind of stuff, that's one thing.  She's indicating that this quote special job created for her was actually done before.  It was done before, it was a position - or was a step that was done and she did it for six and half years.  I don't know about you, but never really noticed that the mills were the kindest employers in creating jobs for individuals.

(Tr. 570-71).

26

upon the foregoing, the ALJ relied on incorrect legal principles and on conclusions reached in direct contravention to the substantial evidence of record in reaching his decision.

### CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

June 17, 2009

Greenville, South Carolina

27